## CIA EXPORTADORA E IMPORTADORA MEXICANA, S. A., v. MARRA BROS., Inc., et al.

District Court, S. D. New York.

Oct. 16, 1944.

Kirlin, Campbell, Hickox, Keating & Mc-Grann and James H. Herbert, all of New York City, for plaintiff.

Duncan & Mount and Frank A. Bull, all of New York City, for Beard's Erie Basin, Inc.

Lord, Day & Lord, Thomas F. Daly and Joyce Stanley, all of New York City, for Marra Bros., Inc.

BONDY, District Judge.

This action was brought by the plaintiff, a Mexican corporation, the owner of a cargo of about 6,000 tons of chick peas, against Marra Bros., Inc., a New York corporation, the lessee of a pier, a section of which collapsed resulting in the loss of, or damage to, some of the peas, and against Beard's Erie Basin, Inc., a New York corporation, the owner and lessor of the pier. The plaintiff contends that Beard's Erie Basin, Inc., leased the pier to Marra Bros., Inc., knowing it to be in a defective and dangerous condition and that it was to be put to a public use, or that Marra Bros., Inc., failed to use reasonable care in tiering and storing the cargo and negligently overloaded the pier.

The complaint alleges that the plaintiff made both defendants parties to the action

so that it may be determined which defendant, if either, is liable and to what extent.

Beard's Erie Basin, Inc., cross-claimed against Marra Bros., Inc., for the cost of repairing the pier, claiming that Marra Bros., Inc., negligently overloaded the pier, and Marra Bros., Inc., counterclaimed against Beard's Erie Basin, Inc., for the loss of profits pending the repair of the pier, claiming that when the pier was leased the lessor knew that it was to be put to a public use and that it knew but failed to disclose that it was in a defective and dangerous condition and not fit to be used for the purposes for which it was leased.

Before the cargo arrived Gonzalez, representing the plaintiff, telephoned Firth, vice-president of Beard's Erie Basin, Inc., requesting storage of the cargo in its warehouses. They being full Firth suggested to Gonzalez that the cargo be stored on a pier which it had leased to Marra Bros., Inc., and Firth requested Charles Marra, president of Marra. Bros., Inc., to take the cargo on the pier because plaintiff was one of Beard's regular customers and its warehouses were full.

Thereafter, Gonzalez accepted the written offer made by Marra Bros., Inc., with reference to the discharge of about 6,000 tons of chick peas at its pier. It stated, "Tallying, tiering on pier and watching for thirty (30) days after vessel's arrival—65¢ per ton of 2240 pounds. Pier rental: $75. per day from the date of vessel's arrival to date all cargo is removed from the pier. It is further agreed that after 30 days from date of vessel's arrival, we may order the cargo removed."

On May 28, 1941, the day after the discharge of the cargo was commenced, Waldenburg, assistant secretary and superintendent of Beard's Erie Basin, Inc., told Charles Marra and Anthony Marra, vice-president of Marra Bros., Inc., that some of the bags that were being discharged were being piled too high on the pier and in violation of its covenant not to place upon the pier any greater dead weight than 400 pounds per square foot. He testified that he told Charles Marra, "You had better look out because it is overloading the pier" and that Marra said, "We can not get it all on the pier unless we keep it up high" and that the Marras also told him, "Don't worry we know what this pier will take."

About midnight on June 12th, nine days after completion of the discharge, a section of the east side of the pier collapsed.

The pier is about 500 feet in length and about 100 feet in width. The collapsed section was about 80 feet in length and 40 feet in width.

Creagh, a roundsman for Beard's Erie Basin, Inc., Weigand, an engineer who repaired the pier, Pretat, maintenance engineer of Beard's Erie Basin, Inc., Moylan, a patrolman no longer in the employ of Beard's Erie Basin, and Waldenburg testified that immediately after the collapse or within a day thereafter they counted piles 22 bags high in the collapsed area and adjacent area, and some of them testified that they saw bags piled 28 bags high. Blue prints and photographs disclose that bags were piled 22 bags high in some sections of the pier. The dead weight of each bag amounted to about 28 pounds per square foot, of piles 16 bags high to about 450 pounds per square foot and of piles 22 bags high to about 615 pounds per square foot. The piles more than 16 bags high exceeded the limitation stated in the lease. Marras knew the pier was old. They knew or should have known its condition. Although it had been in this defendant's possession and under its control for four or five years under yearly leases, no one on its behalf ever made a careful inspection of the piles supporting the pier. No one on its behalf measured or weighed the bags until after the collapse or ever considered how high they could be piled without overloading the pier. Without taking any of these precautions they distributed this heavy cargo unevenly and overloaded the pier as is confirmed by the fact that in the collapsed area the piles broke under the water line where they were sound.

In an effort to shift the responsibility for the collapse to Beard's Erie Basin, Inc., Marra Bros., Inc., introduced evidence to establish that when leased a superficial visual examination would have revealed that the pier was in a dangerous and unsafe condition and unfit for the purpose for which it was leased. If so, this same evidence would establish that a reasonable inspection by Marra Bros., Inc., would have disclosed that it was dangerous and unsafe to load and store the cargo on the pier, especially without making some inspection and without measuring or weighing the bags and determining how high they could be piled without overloading it.

The agreement between plaintiff and Marra Bros., Inc., did not transfer possession of or control over the pier from Marra Bros., Inc., to the plaintiff. The re-

lationship between them was that of bailor and bailee and not lessor and lessee. Marra Bros., Inc., kept a watchman at the entrance of the pier. It kept employees on the pier and maintained headquarters for its equipment on the pier. It stored some of the cargo in a shed adjacent to the pier. It charged plaintiff for wharfage. It had the peas in its possession and under its control. It tallied the cargo and took receipts for it upon its discharge from the pier. It claimed damages from Beard's for loss of use of the pier during a part of the time that the peas were on the pier. All these acts are inconsistent with the contention that it leased the pier to the plaintiff and did not undertake as bailee to store the cargo on its pier.

That the plaintiff had men watching its pier to protect its insurance and that the agreement used the words "Pier rental $75.00 per day from the date of the vessel's arrival to the date all cargo is removed" did not give the plaintiff possession of or control over the pier and did not create the relationship of lessor and lessee. See Lockwood v. Manhattan Storage & Warehousing Co., 28 App.Div. 68, 50 N.Y.S. 974; Jones v. Morgan, 90 N.Y. 4, 43 Am. Rep. 131; Alford v. United States, 10 Cir., 113 F.2d 885, 887.

█ The court finds that this defendant failed in its duty to the plaintiff, imposed by law, to use reasonable care in discharging, tiering and storing the cargo and that the proximate cause of the damage was overloading.

The more difficult question is whether the pier when it was leased to Marra Bros., Inc., was in a dangerous and defective condition and, if so, whether Beard's Erie Basin, Inc., knew or should have known this at the time.

█ "If the premises which are rented are in such a dangerous condition as ' to constitute a nuisance at the time of the renting, the lessor remains liable for the consequences of the nuisance, notwithstanding that his lessee may also be liable. Swords v. Edgar, 59 N.Y. 28, 17 Am.Rep. 295. If the premises are rented for a public use for which he knows that they are unfit and dangerous, he is guilty of negligence, and may become responsible to persons suffering injury while rightly using them." Barrett v. Lake Ontario Beach Improvement Co., 174 N.Y. 310, 314, 66 N. E. 968, 969, 61 L.R.A. 829. The lessor is liable if there existed when he made his lease a dangerous condition that was known to him or by reasonable inspection might have been known. Junkermann v. Tilyou Realty Co., 213 N.Y. 404, 408, 108 N.E. 190, L. R.A.1915F, 700; Fox v. Buffalo Park, 21 App.Div. 321, 333, 47 N.Y.S. 788, affirmed 163 N.Y. 559, 57 N.E. 1109; Edwards v. New York & H. R. Co., 98 N.Y. 245, 50 Am.Rep. 659; Warner v. Lucey, 207 App. Div. 241, 201 N.Y.S. 658, affirmed 238 N.Y. 638, 144 N.E. 924; Lusk v. Peck, 132 App. Div. 426, 116 N.Y.S. 1051; Uggla v. Brokaw, 117 App.Div. 586, 102 N.Y.S. 857.

These principles are applicable not only in case of injury to the person but also in case of damage to property. See Edwards v. New York & H. R. Co., 98 N.Y. 245, 246, 249, 50 Am.Rep. 659; Buffalo Grain Co. v. Sowerby, 195 N.Y. 355, 88 N.E. 569; Vogemann v. American Dock & Trust Co., 131 App.Div. 216, 218, 115 N.Y.S. 741, affirmed 198 N.Y. 586, 92 N.E. 1105; compare Restatement, Torts, sec. 359.

The officers of Beard's Erie Basin knew that the pier was to be put to a public use. They knew of the public character of Marra's business and that Marra Bros., Inc., "would take any ship."

The pier was in substantially the same condition January 1, 1941, when the lease in effect at the time of the collapse was made, as it was June 12, 1942, when the collapse took place, and as it was a year thereafter when it was first inspected by Hargan, a retired expert in the construction of piers. Called on behalf of Marra Bros., Inc., he testified that the shed was not supported by any foundation piles and that there were not any "A" braces or low water braces to prevent the lateral movement of the piles. He examined the west side of the pier abreast of the area that had collapsed and had been repaired. He testified that line piles on that side of the pier were in very poor condition, that they were broken at the top and offering little support to the structure of the dock above. He said one out of every six piles he examined showed some decay or dry rot. Only one of about 300 piles that he examined disclosed fibres at the head that had been crushed. The fibres in that pile spread a little as if a load had compressed them but he could not say whether this condition arose recently or whether it was of long standing. That was the only pile he saw which had not stood the load that had been put on it. It was fifty feet from

where the damage occurred. He testified that he should say the prime factor in the collapse was the matter of loading. On cross-examination he testified that the only thing he found was that some dry rot had set in or started in some of the old piles but that he saw no place where the pier would not support a great deal more than 400 pounds without breaking and that the breaking load for the pier with one defective pile would be 1,200 pounds.

Firth, vice-president, of Beard's Erie Basin, Inc., testified that after its destruction by fire in 1902 the pier was rebuilt, so that it was then really almost an entirely new pier and that a majority of the piles were replaced by new piles and that very few old piles remained.

Waldenburg testified that by proper distribution the entire cargo could have been safely loaded on the pier.

Weigand, construction superintendent and engineer, who was in charge of the repairs for Robbins-Ripley Co., after the collapse testified that the piles which he removed were sound. They seemed to be from 25 to 30 years old. He did not see any dry rot in any of the piles. The outside top of the piles which were exposed to the air may have been soft. The sap wood for an inch or so may have been soft, but that did not weaken the pile so long as the pile still had a sound heart. Under the water line all the piles were sound. Piles remain useful and last indefinitely long under water.

Pretat, the maintenance engineer for Beard's Erie Basin, Inc., testified that in 1927 some of the interior piles were repaired, posted and capped, that in 1935 fender piles and side bearing piles were repaired, but that in the 13 years while he was there, no repairs were made to piles under water other than to the side bearing piles. He inspected the pier on an average of every six months. He made an inspection under the pier on an average of once a year. He made a visual examination of the pier about three months before the collapse, around the outside in a boat, from which he looked under the pier from end to end. He saw parts of piles that were slightly decayed but never saw any rotten piles.

■ This testimony does not disclose that the collapse was caused by rot or decay in any part of the piles above the water line. The weight-bearing piles broke under the water line, where they remain sound longer. It therefore can not be said that the collapse was due to any visible decay of the piles above the water line or that the pier was in a dangerous or defective or unfit condition when the lease was made or when the collapse took place.

Sales were made by or on behalf of the plaintiff in May and June, 1941, of 500 bags of peas of the same size and quality as those lost, at $6.30 per 100 pounds duty paid. This price included duty of $1.75 per 100 pounds, selling commission of .07½ per bag or .068 per 100 pounds, commission of 25¢ per 100 kilos or 11¢ per 100 pounds allowed plaintiff's American representative, and an average differential of .15 per 100 pounds in the selling price between small and large quantities, none of which had been incurred on the peas that were lost, resulting in a value of 4.37 cents per pound.

The plaintiff accordingly is entitled to judgment against the defendant, Marra Bros., Inc., for $4.22 per 100 pounds or $36,-142.61 on 7786 bags each weighing 110 pounds with interest thereon from June 13, 1941.

Marra Bros., Inc., did place more than 400 pounds per square foot on the pier in violation of its covenant. It distributed the weight of the cargo unevenly and negligently overloaded sections of the pier which had supported and could support cargo of the same weight properly distributed. It failed to give notice in writing of any repairs required. The lease provided that the obligation of the landlord to keep the demised premises in repair shall not accrue until written demand stating the particular repairs to be made is given to the landlord, and that the landlord shall not be liable for any damage because of its failure to keep said premises in repair except upon the landlord's failure to make such repairs within a reasonable time after the service of such written notice.

■ The fact that Beard's Erie Basin, Inc., often made repairs without such written request did not impose upon it any obligation to make repairs in the absence of a written request. Potter v. New York, Ontario & Western R. Co., 233 App.Div. 578, 583, 253 N.Y.S. 394.

■ There should be deducted from Beard's claim of $20,934.51 for the reasonable cost of repairing the pier $350 charged for surveys which had nothing to do with

the reconstruction, and $800 the cost of installing braces. Beard's accordingly is awarded judgment for $19,784.51 against Marra Bros., Inc., the counterclaim of Marra Bros, Inc., against Beard's Erie Basin, Inc., and the complaint as against Beard's Erie Basin, Inc., are dismissed.